## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

ADVOCACY TRUST, LLC as
ADMINISTRATOR OF THE
ESTATE of JAVIS WALKER and
DONALD WALKER,

        Plaintiffs,

v.

DOLGENCORP, LLC, DOLLAR
GENERAL CORPORATION,
And DGRE ALBANY, LLC,

        Defendants.

CAFN: 1:19-CV-00141-LAG

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF MATTHEW W. NORMAN, M.D.

COME NOW, Defendants in the above-styled action and, pursuant to Fed. R. Evid. 702 and Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), file this Memorandum of Law in Support of their Motion to Exclude the Testimony of Matthew W. Norman, MD relying on the following in support thereof:

## INTRODUCTION AND RELEVANT FACTUAL BACKGROUND

Javis Walker, the decedent in this action, visited the Dollar General store located at 1906 East Oglethorpe Boulevard in Albany, Georgia on October 13, 2017. When he arrived at the store, there was an attempted armed robbery in progress.  The

decedent stood outside the store's glass doors for approximately ten seconds, after which he opened the door and engaged the gunmen, throwing what appears to be a cooler at them.  There was a brief scuffle before the gunmen fled the store, fatally shooting the decedent on their way out.  Plaintiffs have retained psychiatrist, Dr. Matthew Norman, in an attempt to counter the causation issues posed by the decedent's intervention in the armed robbery.

Dr. Norman authored a report opining as to the decedent's ability to comprehend the danger of the situation and as to his level of intelligence.  In his report, Dr. Norman opines that to "a reasonable degree of medical probability, Mr. [Javis] Walker was not an adult of ordinary intelligence," and that his "ability to reasonably perceive the danger on October 13, 2017" was impaired.  Because Dr. Norman never examined the decedent, never spoke with any individual who lived with the decedent and disregarded the findings of providers who actually examined the decedent, his opinions are not based on sufficient facts and data, nor are they the result of reliable testing or methods and should therefore be excluded.  Moreover, Dr. Norman's opinions will not assist the trier of fact.

## ARGUMENT AND CITATION TO AUTHORITY

Rule 702 of the Federal Rules of Evidence provides the framework for analyzing the admissibility of expert testimony, and states that an expert witness

may provide opinion testimony:

> [I]f [his] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the witness has applied the methods reliably to the facts of the case.

Fed. R. Evid. 702 (emphasis added).  When performing this analysis, the district court acts as a gatekeeper to ensure testimony that does not satisfy this standard is excluded.  Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004); Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311-12 (11th Cir. 1999) (noting "the judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value").   The offering party bears the burden of demonstrating the proffered expert testimony is admissible.  Hall v. United Ins. Co. of Am., 367 F.3d 1255, 1261 (11th Cir. 2004); McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004).

The factors identified in Rule 702 have been interpreted to require proof of the following: (1) the expert is qualified to testify regarding matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and

(3) the testimony will assist the trier of fact, through the application of scientific, or specialized expertise, to understand the evidence or to determine a fact in issue. City of Tuscaloosa v. Harcross Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) *citing to* Daubert, 509 U.S. at 589 and Fed. R. Evid. 702. Even though there may be overlap in the analysis, each of the three prongs is a distinct and individual concept – for example, while qualifications may bear upon the reliability of testimony, they are not a guarantor of the same. Quiet-Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). Dr. Norman's testimony fails to satisfy the second and third prongs of this test and, consequently, should be excluded.

### A.     Dr. Norman's opinions are unreliable as they are not based on sufficient facts or data.

Fed. Rule Evid. 702 (b) provides that a witness who is qualified as an expert by knowledge, skill training or education may testify in the form of an opinion or otherwise if  "(b) the testimony is based on sufficient facts or data..."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) sets out a checklist for trial courts to use in assessing the reliability of scientific expert testimony; however, it is not presumed to be definitive.  This checklist, while not exhaustive, has been held to apply to testimony based on experience as well as that based on scientific knowledge.  Kumho Tire Co. v. Carmichael, 119 U.S. 1167, 1171 (1999).

Plaintiffs' expert does not base his opinions on any facts or objective data, as required by Fed. R. Evid. 702(b).  Dr. Norman opines as to the intellectual capacity of a patient he never personally examined, and blatantly disregarded the available data regarding the decedent's intelligence that is included in the records from medical providers who did examine the decedent.  Dr. Norman made no effort to speak with any those medical professionals.   In formulating his opinions, Dr. Norman purportedly reviewed the following materials: Chicago school records (6 pages), Social Security Administration documents (52  Pages), CCTV video,  the depositions of the decedent's family members (Valeria Williams, Donald Walker, Tamara Walker) and 19 pages of crime reports made by the decedent while he lived in Chicago. Dr. Norman also purportedly relied on an unrecorded telephone interview with Timothy Haire, a friend of the decedent.  *See* "Exhibit A," Mathew Norman Dep. selections, (hereinafter, Norman Dep.), P. 19; Exhibit 4 to Norman Dep.  Dr. Norman did not, however, speak with the aunt or uncle who lived with the decedent during the last 10+ years of his life.  Id. 38:5-10.  He did not interview the decedent's mother, father, siblings or any other relatives.  Id. at 38: 18 – 39:4. He did not interview any witnesses to the shooting. Id. 39:5-8.  Dr. Norman did not review any medical records of the decedent, other than the incomplete records of the

Social Security Administration ("SSA"). Id. 39:9-12.  Dr. Norman is simply not in a position to offer a reliable opinion as to the decedent's intelligence.

Dr. Norman bases his findings, in part, on evaluations by four other practitioners, whose reports were included in the SSA records:  Dr. Upadhyay, Dr. Keraus, Dr. Taschner, and Dr. Dubose. Three of those evaluations, those of Dr. Upadhyay, Keraus and Taschner, were completed in 2008 or 2009.  Only Dr. Dubose examined the decedent close in time (2016) to the Dollar General incident.  It does not appear the underlying test data from those four practitioners were included in the SSA records; the records include reports, narratives, and functional capacity assessments.   The Fed. R. of Evid. 703, which governs the appropriate bases of expert testimony, contemplates a practitioner's reliance facts or data that experts in a particular field would rely on;  and the notes of the Advisory Committee includes "reports and opinions from nurses, technicians and other doctors." However, it is imperative that a testifying expert actually *rely* on the information in the records they review. The opinions included in the SSA records on which Dr. Norman purports to rely do not support the conclusion that the decedent was not of ordinary intelligence or that he was incapable of appreciating the dangers of intervening in an armed robbery.  Federal courts have held, "[e]xpert testimony relying on the opinions of others should, of course, be rejected if the testifying expert's opinion is too

speculative ... or the underlying basis is faulty.  *See* <u>Wilson v. Taser Intern, Inc.,</u> 2008 WL 6875003 (N.D.Ga. 2008) citing to <u>Walker v. Consol. Rail Corp.,</u> 111 F. Supp. 2d 1016, 1018 (N.D. Ind. 2000).  Dr. Norman's opinions in this case are speculative and faulty as they are contrary to the medical evaluations on which he claims to have relied.

First, in a review of Dr. Norman's assessment of Dr. Upadhyay's records, Dr. Norman never spoke to Dr. Upadhyay, *nor did he have access to the notes or testing data prepared by Dr. Upadhyay*.  Norman Dep., P. 23:5; 29:17-20.  Dr. Norman admits that Dr. Upadhyay noted that **the decedent's judgment and insight are baseline and his cognition and memory are intact**.  Norman Dep., 33: 12 – 18. Dr. Upadhyay's report noted the decedent's uncle stated the decedent was a "quick learner" and "a sharp kid;" and that the decedent picked up on projects quickly <u>Id.</u> 33:11-14, 18-20. At the evaluation, the decedent could spontaneously and appropriately respond to questions. <u>Id.</u> 33:18-20. Dr. Norman admits the decedent was not noted to need medication.  Norman Dep. at 33: 19-22. Dr. Norman did not have access to the tests and data from this visit yet, despite the overall assessment of the decedent's capacities as average, Dr. Norman opines that the decedent was "not of ordinary intelligence."  This opinion flies in the face of the assessment by a medical doctor who had the benefit of personally examining the decedent.

Similarly, Dr. Norman reviewed the records from a 2009 evaluation completed by Dr. Keraus.  Again, Dr. Norman did not speak with Dr. Keraus.  Id. at 34: 10 -12.  Dr. Keraus noted the decedent was "**generally logical and coherent**" in his thought processes. Id. at 35:12-15.  In fact, Dr. Keraus indicated the decedent was "**overall within the average range of intelligence**" and was in "the high average range for abstraction" on the Shipley Institute of Living Scale.  Norman Dep., 36: 14-20.  Dr. Keraus also noted the decedent had "at least somewhat adequate social skills." Id. 36:21-24.  Despite Dr. Keraus's findings which are based on an actual examination and testing, Dr. Norman claims the decedent was intellectually impaired.

 Dr. Norman also reviewed a 2009 evaluation conducted by Myra Tashner, EdD, which assessed the decedent's intellectual function to be in the **average range**. Id. 40:  21-25.  Dr. Norman did not speak with Dr. Tashner or review her notes and, despite her finding of average intelligence, Dr. Norman claims the decedent was not of "ordinary intelligence."

Finally, Dr. Norman purportedly relied on a 2016 psychological evaluation conducted by psychologist, Philip Dubose, PsyD, that included a two hour in-person interview with the decedent.   Norman Dep., P. 41:1-12.  Dr. Dubose completed a mental status examination, finding the decedent's attention and concentration were

adequate for normal conversation and that his thought processes were linear, relevant and non-bizarre.  Id.  44-45.  The decedent's ability to use abstract thinking was noted as good. Id. at 46:1-3.  Dr. Norman admits Dr. Dubose noted that the decedent was capable of understanding detailed instructions without difficulty and **his adaptation was sufficient for avoiding ordinary hazards**, adjusting to changes in routine and setting realistic goals.  Id., at 48: 18 – 49:1.  Dr. Norman was unable and unwilling to presume what Dr. Dubose meant by his use of the phrase "adaptation was sufficient for avoiding ordinary hazards" without speaking with Dr. Dubose, yet he undertook no effort whatsoever to contact Dr. Dubose or seek any clarification. Id.  Despite being unwilling to acknowledge the plain language of the Dubose assessment—that the decedent was capable of avoiding ordinary hazards—Dr. Norman proclaims the decedent was "not of ordinary intelligence" at the time of his shooting.  See Exhibit 4 to Norman Depo.

Dr. Norman has no evidence the decedent had a decreased IQ. Id. 58:10-13. Not only are Dr. Norman's findings contrary to those of medical professionals who actually examined and tested the decedent, he relies on no objective data and merely draws his own speculative conclusions.  In Wilson v. Taser Intern., Inc., the Northern District of Georgia evaluated the opinions of a physician who, after relying on the records of other physicians, opined that TASER exposure was the cause of the

plaintiff's injury.  The <u>Wilson</u> court found that the records on which the plaintiff's expert relied did not definitively indicate that TASER exposure was the cause of the injuries and therefore was not reliable support for the expert's opinions.  The <u>Wilson</u> court excluded the proffered expert's opinions on causation.  Similarly, in this matter, the available records do not definitively indicate that the decedent was of below average intelligence or was otherwise incapable of appreciating dangerous situations.  To the contrary, the available records consistently document that the decedent actually functioned within the average range of intelligence.  Norman Dep., 36:15-17.  Dr. Norman inexplicably ignores these findings and bases his opinions on his own speculation.

Further, Dr. Norman ignores witness testimony from the only individuals who actually lived with the decedent.  The decedent's mother testified he was a pretty good student (graduated in the top third of his class with a 2.3898 GPA), was good at math, had never been held back, and did not have an individualized education plan at any point during his schooling.  *See* "Exhibit B," Valerie Williams Dep. selections, hereinafter, "Williams Dep.", P. 27.  Moreover, Ms. Williams testified she taught the decedent right from wrong and that he understood danger and how to avoid danger.  Williams Dep., P. 29: 10-13.  She confirmed that the decedent knew guns were dangerous and had been taught to avoid guns.  Williams Dep., 35: 2- 4&

6-16; 60: 11-13.  Dr. Norman understood Ms. William's testimony to include that based on her mother's 21-year experience raising and living with the decedent, he was capable of appreciating that intervening in an armed robbery was dangerous. Norman Dep. P. 75:12-14; P. 75:16-21.  Dr. Norman purportedly reviewed this testimony, yet it had no effect on his opinions about the decedent's intelligence or ability to perceive and respond appropriate to a dangerous situation. Norman Dep., P. 75:912, P. 76: 8-10.  Dr. Norman reviewed crime reports showing the decedent was the reporting victim of multiple incidents of battery and robbery in Chicago, yet these reports inexplicably had no effect on Dr. Norman's opinions.  Id., P.77:1-4; 81:1-8; 19-25.

When asked what examples he saw that lead him to believe the decedent was unable to appropriately respond to a dangerous situation, Dr. Norman replied "it's based on the totality of the written review," including that the decedent obtained "social security disability for those impairments" and that the decedent "played his video game for almost the duration of [one of] the [prior] examination[s]." Norman Dep., P. 59:5-15.  However, many people qualify for government aid for personality disorders or any number of medical conditions; the receipt of government assistance does not mean a person is unintelligent or incapable of comprehending danger.  Dr. Norman acknowledges that not a single medical report states or even hints at an

inability to perceive or respond appropriately to a dangerous situation. Norman Dep., P. 84:24 – 85:5.  Dr. Norman simply disregards the totality of the evidence, all of which indicates the decedent was of normal intelligence.

**B**.  **Dr. Norman's testimony should be excluded because it is not the product of reliable principles and methods and he has not applied any principles    and    methods    to    the    facts    of    the    case.**

Daubert's reliability prong sets out guidelines that a ... court may consider in assessing the reliability of the expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.  *See* Daubert, 509 U.S. at 593-94; Allison v. McGhan Medical Corp., 184 F.3d 1300, 1312 (11th Cir. 1999); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S. Ct. 1167 (1999).  This inquiry must focus "solely on the principles and methodology [of the experts], not on the conclusions that they generate." Stoner v. Fye, 2017 WL 1294439 (M. D. Ga. 2017).

**1.  Dr. Norman does not rely on any discernible methodology in forming his opinions.**

Dr. Norman performed no tests, relied on no peer-reviewed publications relevant to this case, and has not participated in any research studies relevant to the

case.  Norman Dep., P. 14: 4-10.  He fails to identify any methodology that underlies his evaluation of the decedent and his alleged impairments.

For expert analysis to be admissible in court, it must be subjected to the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152, 119 S.Ct. at 1176 Jack v. Glaxo Wellcome, Inc., 239 F. Supp. 2d 1308, 1316 (N.D. Ga. 2002).  Dr. Norman did not interview the decedent, nor did he speak with any clinician who did.  Dr. Norman did no testing of his own. Id.  at 27:22-24.  Dr. Norman admits that, outside of the DSM-5 diagnoses for schizotypal personality disorder (or possibly autism spectrum disorder), he did not rely on any medical literature or scholarly articles whatsoever in formulating his opinions.  Id. at 27:17-21.

Dr. Norman did not speak with the woman identified as the decedent's aunt, with whom he lived at the time of his death and had been living with for nearly a decade. Norman Dep., P. 38: 5-10.  He acknowledges the decedent's family members would have the best knowledge of the decedent's day to day existence, yet he never interviewed any of the decedent's relatives.  Norman Dep., P. 38: 18-P. 39: 2; P. 43: 5-10, 20-22.  Dr. Norman never interviewed a witness to the shooting event. Norman Dep. P. 39: 5-8.  He never reviewed any other medical reports outside of those included with the SSA records.  Norman Dep., P. 39: 9-12.  Dr. Norman does

not even know if the SSA records he reviewed are complete.  Id. P. 39: 16-20.  He did not request any additional records. Id. at 39: 13-15.  Dr. Norman identifies absolutely no methodology behind his conclusion about the decedent's intellect. Moreover, he cannot point to a single entry in the records supporting his opinions as related to any impairment in decedent's cognition, perception and behavior. Id. at 90. Dr. Norman simply states, "given his [the decedent's] diagnosis, his listed impairment and psychiatric issues and watching the video … he does not appear to appreciate the danger within the situation.  I mean, on its face, it somewhat speaks for itself…" Norman Dep. at 86:19-25.  This is classic *ipse dixit*.  The idea that something could, "speak for itself," belies the fact that Dr. Norman's opinions are his subjective assessment and not an opinion based in verifiable methodology or on available facts.

Dr. Norman further opines that the decedent "had impairments in his perception of reality, concentration, ability to understand a piece of information and social interactions …," and that these impairments led to Norman's opinion that "Mr. Walker was not an adult of ordinary intelligence."  Norman Report, P. 4. However, Dr. Norman never defines what these alleged "impairments" are, nor does he quantify the severity of the supposed impairments.  He can only state, "[the decedent's] ability to reasonably perceive the danger in the Dollar General on

October 13, 2017, would have been impaired based on the evidence review," and in fact, stated "it would be difficult to ascertain or provide further specificity" as to the extent of the impairment.  Norman Dep., P. 85:22- 86:2; Norman Report, P. 4.  Dr. Norman does not connect any reliable methodology in his determination of the decedent's intelligence or capacity, and his opinions should therefore be excluded.

### 2.  Dr. Norman's opinions should be excluded on the grounds that they are solely based on the *ipse dixit* of Dr. Norman.

When an expert's opinions are based *solely* on the experience of a proffered expert and not on any quantifiable data or reliable testing, those opinions must be excluded. "[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."  <u>Cook v. Sheriff of Monroe Cty.</u>, 402 F.3d 1092, 1111 (11th Cir. 2005) (quotation and citation omitted).  "If a witness is relying only on experience, he 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" <u>Frazier</u>, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 Advisory Committee's note (2000 amends.)).  Here, Dr. Norman does not rely on any quantifiable data or reliable testing – he conducted no tests of his own, did not review the testing data of other clinicians and, in fact, appears to ignore relevant data contained in the reports of the decedent's prior providers.  Dr. Norman believes, "the

diagnosis," and the video "speak for themselves." Norman Depo.,86:19-25.  These statements indicate Dr. Norman does not rely on specialized scientific experience, but instead, on a subjective view of the evidence.  It is for the jury to assess questions not grounded in scientific data, and it is the duty of the Court to act as the gate-keeper and exclude expert opinion when "there is simply too great an analytical gap between the data and the opinion proffered." Joiner, 522 U.S. at 146, 118 S.Ct. 512 (holding that the trial court did not abuse its discretion in excluding testimony on that basis).  Further, a trial court may exclude expert testimony that is "imprecise and unspecific," Frazier, 387 F.3d at 1266 (finding no abuse of discretion when the trial court concluded that an "imprecise and unspecific" expert opinion would not assist the jury, and observing that the expert's "imprecise opinion easily could serve to confuse the jury, and might well have misled it"); Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1111 (11th Cir. 2005).  Dr. Norman's subjective opinions are exactly the type of testimony that should be excluded as they are grounded solely in the *ipse dixit* of the expert, and not in scientific methodology.

## B.      Norman's findings are not helpful to the trier of fact.

The final requirement for admissibility of expert testimony is that it be helpful to the trier of fact.  Fed. R. Evid. 702(d).  Unreliable, and unhelpful testimony does not assist the jury.  Torres v. Carnival Corp., 635 Fed. Appx. 595, 600 (11th Cir.

2015) (holding that district judge properly excluded expert witness testimony when his opinions fell within common knowledge of the jurors and the problems with the proffered expert's testimony revealed it to be unreliable, confusing and unhelpful). The subject of an expert's testimony should be "'scientific ... knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than *subjective belief or unsupported speculation*. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589–90, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993). *Emphasis added.* [E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Stoner v. Fye, No. 5:15-CV-102 (CAR), 2017 WL 1199742, at *4 (M.D. Ga. Mar. 31, 2017)

Ultimately, Dr. Norman's testimony invades the province of the fact-finder: he has subjectively viewed and weighed the evidence as he personally sees fit, without satisfying the elements of Daubert, and has opined generally that there were "impairments" without being able to quantify or define what those impairments might be. His testimony as to the decedent's intellectual capacity is nothing more than speculation that flatly contradicts the available evidence. Dr. Norman never examined the decedent; Dr. Norman never spoke with anyone who examined the decedent; Dr. Norman never spoke with any individual who lived with the decedent;

Dr. Norman spoke with a single individual, for approximately 15 minutes as to the decedent's personality.  Dr. Norman disregarded the testimony of individuals who knew the decedent. A jury can analyze the same evidence as Dr. Norman and form their own opinions; Dr. Norman's medical credentials add no greater credibility or specialized knowledge to the inquiry of decedent's intelligence.  However, his profession gives improper weight to his subjective opinions.  Indeed, expert testimony can have a "powerful and potentially misleading effect … 'Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.'" *see* Frazier at 1263.  A jury will put too great a weight on the M.D., and may substitute Dr. Norman's subjective opinion for their own assessment of the same evidence in this matter, despite the fact that Norman utilizes no special medical training or knowledge in forming his opinions.

Dr. Norman's opinion testimony as to the decedent's alleged "impairments" and intelligence level will not assist the jury, and may improperly sway their opinions, and should therefore be excluded.

## **CONCLUSION**

Plaintiff's proposed expert fails to base his opinions in any objective facts or data, and, in fact, ignores relevant assessments included in the medical records.

Instead he relies instead on his "experience," without utilizing any discernible methodology.  Dr. Norman's opinions are unreliable, and will not assist the trier of fact; therefore, Defendants respectfully request that this Court exclude the testimony of Dr. Matthew W. Norman.

This 21st day of May, 2021.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ Erica L. Morton*

_____
Erica L. Morton, Esq.
Georgia Bar No.: 140869
Brianna S. Tucker, Esq.
Georgia Bar No.: 109297
*Attorneys for Defendants*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1355 Peachtree Street, NE, Suite 300
Atlanta, Georgia 30309-3231
Phone: (404) 888-6146
Fax: (404) 888-6199
Email: erica.morton@swiftcurrie.com
Email: brianna.tucker@swiftcurrie.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | |
|---|---|
| ADVOCACY TRUST, LLC as ADMINISTRATOR OF THE ESTATE of JAVIS WALKER and DONALD WALKER,<br><br>        Plaintiffs,<br><br>v.<br><br>DOLGENCORP, LLC, DOLLAR GENERAL CORPORATION, And DGRE ALBANY, LLC,<br><br>        Defendants. | CAFN: 1:19-CV-00141-LAG |

## CERTIFICATE OF SERVICE

I certify that on this date I have electronically filed this ***Defendants' Memorandum of Law in Support of Motion to Exclude the Testimony of Matthew W. Norman, M.D.*** with the Clerk of Court using the CM/ECF (Pacer) system which will automatically send email notification of such filing to the following attorney(s) of record:

*(Continued on following page)*

- 20 -

J. L. King, II, Esq.
THE KING FIRM
1603 N. U.S. Hwy 41
P.O. Box 746
Tifton, GA 31793
Email: JL@Kingtriallaw.com.com

Ronnie E. Mabra, Jr., Esq.
THE MABRA FIRM, LLC
197 Fourteenth Street, NW, Suite 200
Atlanta, GA 30318
Email: ronnie@mabrafirm.com

Naveen Ramachandrappa, Esq.
BONDURANT, MIXSON & ELMORE, LLP
1201 W. Peachtree Street, NW, Suite 3900
Atlanta, GA 30309
Email: ramachandrappa@bmelaw.com

Jackson "Jad" Dial, Esq.
David "Dave" Dial, Esq.
WEINBERG WHEELER HUDGINS GUNN & DIAL
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
Email: jdial@wwhgd.com
Email: ddial@wwhgd.com

*(Signature on following page)*

This 21st day of May, 2021.

Respectfully submitted,

SWIFT, CURRIE, MCGHEE & HIERS, LLP

*/s/ Erica L. Morton*
_____
Erica L. Morton, Esq.
Georgia Bar No.: 140869
Brianna S. Tucker, Esq.
Georgia Bar No.: 109297
*Attorneys for Defendants*

SWIFT, CURRIE, MCGHEE & HIERS, LLP
1355 Peachtree Street, NE, Suite 300
Atlanta, Georgia 30309-3231
Phone: (404) 888-6146
Fax: (404) 888-6199
Email: erica.morton@swiftcurrie.com
Email: brianna.tucker@swiftcurrie.com