## 13

1  that is correct.
2      Q    So then out of roughly 3,000
3  forensic investigations that you've conducted,
4  only about a dozen or so were of patients that
5  you were unable to interview or evaluate
6  directly?
7      A    That would be correct.
8      Q    And what is your hourly rate for
9  litigation consulting?
10     A    $600 an hour.
11     Q    And that is inclusive of what?
12     A    My time.
13     Q    Document review, testimony, it's
14  just flat rate $600 an hour?
15     A    That is correct.
16     Q    And what about your time for
17  appearing here today?
18     A    That is based on either a half day
19  or a whole day.  I found that easier than
20  trying to keep track of the clock because
21  there's travel time back and forth, and
22  in-court appearances, oftentimes court sitting
23  on a bench.
24         So it's $3,000 for a half day and
25  $6,000 for a whole day.

## 14

1      Q    So then $3,000 here today even if
2  we wrap in an hour or two?
3      A    That's correct.
4      Q    Have you authored any peer
5  reviewed publications that you consider
6  relevant to the case we're here about today?
7      A    No.
8      Q    Have you participated in any
9  research studies that you consider relevant to
10  the case that we're here about today?
11     A    No.
12     Q    Going to page five of your c.v.
13  under your list of publications --
14     A    Yes.
15     Q    -- looking at Defendant's Exhibit
16  2 --
17     A    Yes.
18     Q    -- the very first entry, the So
19  Now What article --
20     A    Yes.
21     Q    -- what was that about?
22     A    Starting a private practice.
23     Q    So nothing to do with the issues
24  in this lawsuit?
25     A    That is correct.

## 15

1      Q    Now, looking through your list of
2  presentations and lectures that begins on page
3  five of your c.v., which if any of those touch
4  on issues that you would consider relevant to
5  this case -- or let me rephrase that --
6  relevant to your opinions in this case?
7      A    Potentially I guess if I look at
8  page six of the list of publications -- I
9  mean, of presentations, Schizophrenia and
10  Related Disorder under the physicians
11  assistant program, Mercer University, would
12  potentially touch on it a bit only because
13  that deals with some of the diagnostic issues
14  that may have come up in some of the records
15  that I reviewed.  That may be true -- perhaps
16  only that one as I look at this list.
17     Q    And I understand you're going off
18  memory, but based on your recollection of that
19  presentation, what portion of that would play
20  into your opinions in this case?
21     A    I'm glad you qualified it.  It is
22  based on my recollection at this juncture, and
23  it's in -- the Schizophrenia and Related
24  Disorders, the qualifier "and Related
25  Disorders" dealt with diagnoses related to

## 16

1  schizophrenia which could include schizotypal
2  personality disorder.
3      Q    And it's pronounced schizotypal?
4      A    That's how I pronounce it.  Yes.
5  It's not schizotypal.  Schizotypal, yes.
6      Q    Well, I would have guessed
7  schizotypal.
8      A    Schizotypal.
9      Q    All right.  I will do my best to
10  say it correctly.
11         Do you know whether that
12  presentation was recorded or whether you
13  provided any written materials for that
14  presentation?
15     A    There may have been -- I don't
16  think it was recorded, although I cannot
17  answer that.  When we -- Mercer University's
18  physicians assistant program could answer that
19  question.
20         As you can see, it was given a
21  number of times.  There was and potentially
22  still could be a PowerPoint.  I'm a few
23  computers beyond May of 2016, but it likely is
24  still saved somewhere.
25     Q    And that's something that you

17

1   could look for and provide to Mr. King?
2      A   I can search for it, and if it
3   exists, I'm happy to provide it to Mr. King.
4      Q   Thank you.  Any other
5   presentations that you have given that are
6   listed in your c.v. that you think may touch
7   on your opinions in this case?
8      A   Not based on my looking at this
9   list of presentations.  Not at this juncture.
10  No.
11     Q   And what about beginning on page
12  ten of your c.v. under the Media
13  Interview/Podcast subheading, are any of those
14  relevant to your opinions in this lawsuit?
15     A   I doubt it, so no.
16     Q   Going back to Defendant's
17  Exhibit 1, the deposition Notice and the
18  Notice to Produce with it, under item two,
19  we've requested a copy of your complete file.
20  Did you bring that with you today?
21     A   I brought it on a zip drive.
22     Q   That's on the zip drive?
23     A   That is correct.  And I did bring
24  a printed copy of what is contained on that
25  zip drive.  So this is a screen grab of

18

1   everything that is on -- all of the electronic
2   records that are on that.
3         MS. MORTON:  We'll go ahead and
4   mark that as Defendant's Exhibit 7.
5         (Whereupon a document was identified as
6         Defendant's Exhibit 7.)
7      Q   (By Ms. Morton) Okay.  Looking at
8   Exhibit A, paragraph 2.A, photographs,
9   reports, depositions and materials of whatever
10  kind, that's everything that you have is
11  included -- or is at least listed in this
12  screen grab that we've marked as Defendant's
13  Exhibit 7?
14     A   Yes.  And is contained on the zip
15  drive.
16     Q   Were you provided with any still
17  photographs?
18     A   I was not.
19     Q   You were provided with some CCTV
20  footage?
21     A   I was.
22     Q   Okay.
23     A   It looks like I have five MP4s.
24     Q   And then reports, what reports, if
25  any, were provided to you?

19

1      A   The Chicago school records and the
2   Social Security Administration documents.  56
3   pages of Social Security Administration
4   documents and I think it's six pages of
5   Chicago school records.
6      Q   And those were documents or
7   reports that you evaluated or considered when
8   coming to the conclusions in your Rule 26
9   report; is that correct?
10     A   That is correct.
11     Q   Now, you have since acquired
12  some -- or been provided with some additional
13  documents; is that correct?
14     A   That is correct.
15     Q   And that includes, it looks like,
16  at least a rough draft of a deposition
17  transcript of Valeria, or Valerie, Williams?
18     A   That is correct.
19     Q   You were provided with a
20  transcript of a deposition of Donald Walker?
21     A   That is correct.
22     Q   And the pdf labeled Javis-Crime
23  Reports?
24     A   Correct.  Which is a 19-page pdf.
25     Q   Okay.

20

1      A   Chicago Police Department incident
2   reports, partially redacted.
3      Q   All pertaining to -- well, Javis
4   Walker, who is also known as Javius Walker or
5   Javius Williams?
6      A   Yes, that is correct.
7      Q   Any of those reports pertaining to
8   Valerie, or Valeria, Williams?
9      A   In my read of those, no.
10     Q   Okay.  You were provided the
11  deposition transcripts of Tamara Walker?
12     A   Yes.
13     Q   Do you have with you a hard copy
14  of the pdf labeled Walker-Haire Interview
15  Notes?
16     A   I do.  That, I do.  I scanned that
17  in and put it as an electronic.
18     Q   And then what about the pdf
19  labeled Walker-Norman Super Bills?
20     A   I have those as hard copies as
21  well.
22     Q   And then the last pdf listed,
23  there's some sort of invoice.  Do you have a
24  hard copy of that?
25     A   I do not.  I do not.

21

1      MS. MORTON:  We can go off the
2  record for a second.
3      (Whereupon off-the-record discussions
4      ensued.)
5      Q    (By Ms. Morton) Have you prepared,
6  Dr. Norman, any addenda or supplement to your
7  initial report after your review of the
8  additional materials?
9      A    I have not.
10     Q    The additional material you've
11 been provided, does it alter any of the
12 opinions set forth in your Rule 26 report?
13     A    It does not.
14     (Whereupon a document was identified as
15     Defendant's Exhibit 4.)
16     Q    (By Ms. Morton) All right.  Let me
17 show you what has been marked as Defendant's
18 Exhibit 4.
19     A    Yes.
20     Q    Do you recognize that document,
21 sir?
22     A    I do.
23     Q    And that is your Rule 26 report;
24 is that correct?
25     A    That is correct.

22

1      Q    Are you board certified in
2  psychiatry?
3      A    Yes.
4      Q    And forensic psychiatry?
5      A    Yes.
6      Q    And have you practiced
7  continuously since initially being licensed?
8      A    Yes.
9      Q    Has your license to practice
10 medicine ever been revoked, suspended?
11     A    No.
12     Q    Looking at your report, your Rule
13 26 report, you address a Disability
14 Determination Services Evaluation conducted in
15 September of 2009.
16     A    Correct.
17     Q    And that was performed by a
18 psychiatrist whose name I'm not even going to
19 try to pronounce.  I will spell it for the
20 court reporter.  The first name is
21 A-N-U-P-A-M-A, the last name U-P-A-D-H-Y-A-Y.
22     All right.  Now, have you ever
23 spoken to that evaluating psychiatrist,
24 Dr. Upadhyay?
25     A    Your pronunciation is as good as

23

1  mine, and the answer to the question is no.
2      Q    Okay.  So you've not consulted
3  Dr. Upadhyay with regard to your opinions in
4  this case?
5      A    I have not.
6      Q    Or his or her evaluation of Javis
7  Walker?
8      A    That is correct.  I have not.
9      Q    And did you have access to any of
10 Dr. Upadhyay's notes or actual testing data?
11     A    I did not.
12     Q    Only what was contained in the
13 Social Security records?
14     A    That is correct.
15     (Whereupon a document was identified as
16     Defendant's Exhibit 6.)
17     Q    (By Ms. Morton) And let me show
18 you what has been marked as Defendant's
19 Exhibit 6.  And then the question, so you know
20 what you're looking for, is does that appear
21 to be a true and accurate copy of the Social
22 Security records that you relied on in forming
23 your opinions in this case?
24     A    It doesn't appear to match the
25 same 56 pages that I have only that it looks

24

1  like it printed funny.  That's all I would say
2  as I look at this.
3      What I see on the pdf, like
4  there's a blank page in here after
5  Dr. DuBose's report, and my pdf does not have
6  a blank page after Dr. -- well, excuse me.  52
7  pages.  So I'm happy to -- I don't want to say
8  it's the same if it's not exactly.
9      Q    That's fine.  Take your time
10 because, yeah, I want to make sure that we're
11 operating off the same information.
12     A    Yeah.  Because there's a blank
13 page in here which I don't see in my copy.
14     Q    And you're welcome to remove that
15 blank page.  I'm sure that was just the way it
16 came off the printer.
17     A    Yeah.  I mean, I don't mean to
18 create work for anybody, but it looks like
19 there are a number of pages after that blank
20 page that looks like they misprinted compared
21 to what I see in front of me as the electronic
22 copy.  It has a few words of what was on that
23 page, but it doesn't look like it was the
24 whole page.
25     Q    Is there anything substantive

25

1   missing?
2       A   Oh, yes, lots of substantive
3   missing. A lot of these are check boxes where
4   they marked moderate or marked impairments and
5   they have the limitation, and this doesn't --
6   this has like a whole blank -- I mean, that
7   would normally have a lot of writing on it.
8   So I'm sorry. I don't --
9       MS. MORTON: We'll go off the
10  record for a second.
11  (Whereupon off-the-record discussions
12  ensued.)
13  (Whereupon a document was identified as
14  Defendant's Exhibit 5.)
15      Q   (By Ms. Morton) While we're
16  waiting on a reprint of Defendant's Exhibit 6,
17  let me go ahead and show you Defendant's
18  Exhibit 5 and make sure that that is a
19  complete and accurate copy of what's also in
20  your file.
21      A   That is.
22      Q   All right.
23      A   That is.
24  (Whereupon a document was identified as
25  Defendant's Exhibit 8.)

26

1       Q   (By Ms. Morton) And other than the
2   handwritten notes that we've now marked as
3   Defendant's Exhibit 8, you have no other field
4   reports or notes of any kind pertaining to
5   this case?
6       A   That is correct.
7       Q   Okay. Thank you. Any diagrams or
8   memos, any letters, anything of that nature?
9       A   I have none.
10      Q   Any correspondence from Mr. King's
11  office?
12      A   No.
13      Q   And no other material whatsoever
14  that was created by you or on your behalf in
15  connection with your investigation of this
16  matter?
17      A   That is correct.
18      Q   Are there any scientific or
19  scholarly articles or publications that you're
20  relying on in connection with your opinions in
21  this case?
22      A   Only as outlined in the Rule 26
23  report. I cited the DSM-5.
24      Q   And which portion of the DSM-5?
25      A   I mean, if diagnoses become

27

1   relevant and I get questioned on them, any
2   diagnoses that is in there, but, in
3   particular, potentially schizotypal
4   personality disorder and potentially autism
5   spectrum disorder.
6       And I did not copy those sections.
7   I simply brought the textbook.
8       Q   Do you have the sections marked?
9       A   Generally, I do. Yes. I was -- I
10  try to be agreeable. Would you like -- I'm
11  sorry.
12      Q   You're fine.
13      A   There wasn't a question on the --
14      Q   You're fine. All right. Anything
15  else besides the DSM-5?
16      A   No.
17      Q   And no scholarly articles at all?
18      A   No.
19      Q   Or scientific, any peer review
20  articles of any sort?
21      A   No.
22      Q   You haven't done any sort of
23  testing of your own; correct?
24      A   Correct.
25      Q   And any other books or

28

1   publications, treatises, learned treatises
2   that you're relying on outside of the DSM-5?
3       A   No.
4   (Whereupon a document was identified as
5   Defendant's Exhibit 9.)
6       Q   (By Ms. Morton) And then looking
7   at what we've marked collectively as
8   Defendant's Exhibit 9, it's a four-page
9   exhibit. And are those all your billing
10  statements to Mr. King or his office for your
11  work in this matter?
12      A   These are -- sort of. Yes. These
13  are internal billing statements that go to the
14  office manager, bookkeeper, to generate an
15  invoice. So these are only internal notes in
16  a way.
17      Q   Did you bring any copies of any
18  invoices?
19      A   Only electronically. There's the
20  one invoice, which I actually don't see it
21  printed now. I have one invoice that I
22  generated and sent to Mr. King that is
23  electronic as a pdf. It's labeled -- there.
24  It's the last document on this piece of paper,
25  Walker v. Dollar General, King, 20-0909_Norman

29

1    invoice.
2    Q    And this document is Defendant's
3    Exhibit 7?
4    A    Yes, it is.  That is correct.
5    Q    All right.  So going back to your
6    Rule 26 report, Dr. Norman, you reviewed the
7    evaluation, the September 2009 evaluation by
8    Dr. Upadhyay?
9    A    Yes.
10   Q    And do you have that available for
11   reference on your laptop there in front of
12   you?
13   A    I'm looking.
14   Q    That's okay.  Take your time.
15   A    I have the reference in front of
16   me.
17   Q    And Dr. Upadhyay conducted a
18   45-minute psychiatric evaluation on
19   September 16th of 2009; is that correct?
20   A    That is correct.
21   Q    And he identified the patient as
22   Javius Williams?
23   A    That is correct.
24   Q    And you understand that to be the
25   same person as Javis Walker?

30

1    A    I am making that assumption.  Yes.
2    Q    Javius Williams presented for that
3    evaluation, or attended that evaluation, with
4    a man identified as his uncle; is that
5    correct?
6    A    That is correct.
7    Q    And his uncle provided some of the
8    information for that evaluation by
9    Dr. Upadhyay?
10   A    That is my understanding.
11   Q    And the uncle reported to
12   Dr. Upadhyay that Javius is a quick learner
13   and he is a sharp kid; correct?
14   A    Correct.
15   Q    And that he was able to focus and
16   concentrate on his video games?
17   A    That is correct.
18   Q    That he picks up very quickly on
19   projects?
20   A    That is correct.
21   Q    All right.  Now, Dr. Upadhyay
22   noted that Javius Williams had an imaginary
23   friend by the name of Edina, E-D-I-N-A?
24   A    Correct.
25   Q    But according to Dr. Upadhyay,

31

1    this imaginary friend wasn't problematic in
2    any way, it was more of a comforting coping
3    mechanism?
4    A    That's how it's described.  That's
5    correct.
6    Q    And Edina, or the voice, never
7    tells him, "him" being Javius Williams, to do
8    bad things?
9    A    That is correct.
10   Q    The voice was also positive?
11   A    That is correct.
12   Q    And Mr. Williams, Javius Williams,
13   actually provided some of the information to
14   Dr. Upadhyay in this psychiatric evaluation;
15   correct?
16   A    That is correct.
17   Q    And including reporting that he
18   got average grades and was not in special
19   education classes?
20   A    That is correct.
21   Q    He did also report a history of
22   abuse by his mother's boyfriend or boyfriends
23   when he was younger?
24   A    Yes.
25   Q    That he had no contact with his

32

1    biological mother or father at that point in
2    time?
3    A    That is correct -- well, I don't
4    know whether that was a compound question.
5    Biological mother and biological father with
6    no contact.  It was labeled as somewhat
7    involved for the biological father, no contact
8    for the biological mother, at least according
9    to that note.  So if I could clarify that.
10   Q    Sure thing.  He also reported that
11   he had no contact with any siblings who were
12   still in the Chicago area?
13   A    That is correct.
14   Q    Now, Dr. Upadhyay noted that
15   Mr. Williams made very minimal eye contact
16   during their session?
17   A    Correct.
18   Q    But he was able to respond
19   spontaneously and appropriately to questions?
20   A    Yes.
21   Q    And he did not display any
22   paranoid ideation; is that correct?
23   A    That is correct.
24   Q    That's a good thing; right?
25   A    Yes.

33

1    Q   Tell us in plain old English what
2  that means.
3    A   It's harder to answer these days.
4  Believing that someone has paranoid ideation
5  is the thought or belief that someone is after
6  you or following you.  That is usually not
7  based in reality.
8    Q   So the fact that Mr. Williams was
9  not displaying those symptoms was a positive
10  thing or a good thing?
11    A   Yes.
12    Q   And then Dr. Upadhyay noted that
13  Mr. Williams' judgment and insight are probably
14  base line; correct?
15    A   That is correct.
16    Q   And that his cognition and memory
17  are intact?
18    A   Correct.
19    Q   Now, Dr. Upadhyay ultimately
20  decided that Mr. Williams was not in need of
21  any sort of psychiatric medication?
22    A   Correct.
23    Q   And to your understanding, was
24  there any follow-up treatment undertaken after
25  that initial evaluation?

34

1    A   Not that I'm aware of.  There was
2  a recommendation to come back in a month and
3  then to see a therapist as needed, but I have
4  no further information on that.
5    Q   Now, you also in your Rule 26
6  report reference an evaluation performed by
7  psychologist John Keraus, K-E-R-A-U-S?
8    A   Yes.  And your pronunciation is as
9  good as I could come up with.
10    Q   All right.  You've never spoken
11  with or consulted with Dr. Keraus, have you?
12    A   No, I have not.
13    Q   And Dr. Keraus also evaluated
14  Javius Williams in September of 2009; correct?
15    A   That is correct.
16    Q   And Dr. Keraus noted that
17  Mr. Williams completed high school?
18    A   Correct.
19    Q   And graduated in the top third of
20  his class?
21    A   That is correct.
22    Q   That he would go with his uncle
23  sometimes to assist with a plumbing business?
24    A   Yes.
25    Q   And could perform at least

35

1  unskilled tasks?
2    A   Correct.
3    Q   Now, Dr. Keraus, like
4  Dr. Upadhyay, evaluated Mr. Williams in a
5  single session; correct?
6    A   That is correct.
7    Q   And during that session,
8  Dr. Keraus made some observations, behavioral
9  observations of Mr. Williams?
10    A   That is correct.
11    Q   And one of the observations that
12  Dr. Keraus made was that Mr. Williams was
13  generally logical and coherent in his thought
14  processes; correct?
15    A   That is correct.
16    Q   And his mood was -- is it
17  euthymic?
18    A   That is correct.
19    Q   Now, tell us in plain old everyday
20  English what euthymic means.
21    A   He's neither depressed nor manic.
22  It is a range.  It's not a bright line by any
23  means.  It's a normal mood.
24    Q   So if you have depressed at one
25  end of the spectrum, manic at the other,

36

1  euthymic is sort of hovering there in the
2  middle range?
3    A   Euthymia is hovering in the middle
4  range.  There's mania at one end of the
5  spectrum, hypomania below that, euthymia below
6  that, kind of dysthymia below that, and major
7  depression below that.  So euthymia is this
8  wide swath in the middle.
9    Q   And Dr. Keraus also looked at some
10  intellectual tests results; correct?
11    A   Correct.
12    Q   All right.  One specifically was
13  the Shipley Institute of Living Scale?
14    A   Yes.
15    Q   And Mr. Williams' performance was
16  well within the average range of intelligence?
17    A   Yes.
18    Q   And, in fact, he was working in
19  the high average range for abstraction?
20    A   That is correct.
21    Q   And Dr. Keraus also noted that
22  Mr. Williams had at least somewhat adequate
23  social skills?
24    A   Yes.  That is correct.
25    Q   And that Mr. Williams was avoidant

37

1   and distrustful?
2       A    Yes.
3       Q    That he had isolated himself.
4   "He," being Mr. Williams, had isolated himself
5   from potential harm?
6       A    Yes.
7       Q    Mr. Williams did not show any
8   evidence of the negative symptoms of a formal
9   thought disorder?
10      A    That is correct.
11      Q    What does that mean?
12      A    So I guess I'll break it down into
13  parts.  Formal thought disorder is psychosis
14  by definition, which is either hallucination
15  or delusion.  The negative symptoms of that is
16  in reference to schizophrenia, which then is
17  either a volition; not having much energy or
18  motivation; apathy, again not much motivation;
19  affective flattening, having no expressed
20  motion.  So those are the negative symptoms of
21  a formal thought disorder.
22      Q    And Mr. Williams wasn't showing
23  evidence of any of those negative symptoms?
24      A    According to that note, that is
25  correct.

38

1       Q    And Dr. Keraus noted that
2   Mr. Williams was generally logical and
3   coherent?
4       A    Yes.
5       Q    Have you ever spoken with the
6   woman identified in any of these reports as
7   Mr. Javius Williams' aunt?
8       A    No.
9       Q    Or the uncle for that matter?
10      A    No.
11      Q    Have you spoken with anybody about
12  Javius Walker or Javius Williams outside of
13  Mr. King or Timothy Haire?
14      A    No.
15      Q    So you've never spoken with a
16  gentleman by the name of Ricky Anglin?
17      A    No.
18      Q    Never interviewed Javius Williams'
19  mother?
20      A    No.
21      Q    His father?
22      A    No.
23      Q    Any of his siblings?
24      A    No.
25      Q    Any other relatives, cousins,

39

1   anything, extended family?
2       A    No.
3       Q    Any roommates, if he had any?
4       A    No.
5       Q    Have you interviewed or have any
6   information from any witnesses to the shooting
7   event?
8       A    No.
9       Q    Have you reviewed any medical
10  records outside of what's contained in that
11  Social Security pdf?
12      A    No.
13      Q    Are there any medical records that
14  you've requested or been unable to obtain?
15      A    No.
16      Q    Do you know whether the Social
17  Security records, as you have them, are the
18  complete Social Security disability file for
19  Javius Williams or Javius Walker?
20      A    I do not know.
21          MR. KING:  I forwarded him
22  everything that we got, which I think you have
23  too.
24          MS. MORTON:  I just know it's not
25  complete.  I'm not saying you didn't.  I'm

40

1   sure you've given me everything you have.
2           MR. KING:  Yeah.
3           MS. MORTON:  I just know they
4   haven't given us everything.
5           MR. KING:  Yeah.  What we've been
6   able to obtain.
7           MS. MORTON:  Yes.
8           MR. KING:  Of course, that was a
9   challenge.
10          MS. MORTON:  Agreed.
11      Q    (By Ms. Morton) Now, there was
12  another evaluation conducted in October of
13  2009, it's October 15th, 2009, more
14  specifically, by a Myrna Tashner, doctor of
15  education.
16      A    That is correct.
17      Q    Okay.  You reviewed that report
18  and relied on that in part in reaching your
19  opinions in this case?
20      A    I did.
21      Q    Now, Dr. Tashner assessed
22  Mr. Javius Williams' function, his
23  intellectual function, to be in the average
24  range; correct?
25      A    Correct.

41

1    Q    And then you also relied on a
2    psychological evaluation by a Dr. DuBose?
3    A    That is correct.
4    Q    And that was performed in November
5    of 2016?
6    A    That is correct.  That is my
7    understanding.
8    Q    Roughly a year before the
9    shooting?
10   A    Correct.
11   Q    And that was a two hour in-person
12   evaluation?
13   A    Yes.
14   Q    And in assessing Mr. Javius
15   Williams', or by now he's being referred to as
16   Javius Walker, current function, Dr. DuBose
17   noted that Mr. Walker was able to bathe, feed,
18   and dress himself independently?
19   A    Correct.
20   Q    He didn't have any trouble getting
21   around.  He was fully mobile?
22   A    On his own two feet.  Yes.
23   Q    Correct?
24   A    That's correct.
25   Q    He wasn't able to drive?

42

1    A    According to the report, that is
2    correct.
3    Q    He was able to do laundry and
4    clean?
5    A    He was able to do laundry and --
6    yes.  He was asked about cleaning and reported
7    doing chores.
8    Q    He was able to use a phone?
9    A    Yes.
10   Q    But when asked about managing his
11   own money, he said he was not able to do that?
12   A    Correct.
13   Q    And Mr. Williams, or Mr. Walker,
14   reported at that point that he would go out
15   for long walks?
16   A    Yes.
17   Q    Do some thinking?
18   A    Yes.
19   Q    Go for long bike rides?
20   A    Yes.
21   Q    And he still enjoyed playing video
22   games?
23   A    Yes.
24   Q    And Dr. DuBose concluded that
25   Mr. Walker's explanation of his day-to-day

43

1    activities seemed to be realistic and on point
2    based on the observations that Dr. DuBose made
3    during the examination?
4    A    That is correct.
5    Q    And some of the information
6    provided to Dr. DuBose was provided by an
7    aunt, Patricia Johnson?
8    A    Yes.
9    Q    But you've never spoken with her?
10   A    I have not.
11   Q    Do you have any plans to speak
12   with her?
13   A    Not at this juncture.
14   Q    Any particular reason why not?
15   A    No.
16   Q    Would it be helpful to your
17   opinions to speak with the people who lived
18   with Javius Walker/Williams?
19   A    Maybe.
20   Q    I mean, those would be the folks
21   that have sort of the best knowledge of his
22   day-to-day existence; right?
23   A    Yes, although there were notations
24   in the medical records and the Social Security
25   Administration that capture a lot of that

44

1    through time in a clinical sense.
2    Q    But anything that happened between
3    the September 2009 evaluations and this 2016
4    evaluation, you don't have access to any of
5    that information, do you?
6    A    That is correct.
7    Q    Dr. DuBose performed a mental
8    status examination of Mr. Williams/Walker?
9    A    Yes.
10   Q    And Dr. DuBose found that
11   Mr. Williams' attention and concentration was
12   adequate for normal conversation; correct?
13   A    Correct.
14   Q    Now, his speech was a normal rate
15   and coherent?
16   A    Well, only in part.
17   Q    Okay.
18   A    Somewhat loud in a formal tone,
19   but otherwise of normal rate and was coherent.
20   Q    So he talked a little loudly and
21   he had sort of a formal, stiff tone?
22   A    Correct.
23   Q    But what he said made sense, the
24   content, according to Dr. DuBose?
25   A    That is correct.

45

1    Q   And Dr. DuBose found that
2  Mr. Williams' thought processes were linear,
3  relevant, and nonbizarre?
4    A   Correct.
5    Q   Is that another way to say normal?
6    A   Not a -- not a -- yes.
7    Q   Okay.  Now, Dr. DuBose also noted
8  with regard to auditory or visual
9  hallucinations, that would be like the
10  imaginary friend Edina?
11    A   Correct.
12    Q   That Mr. Williams didn't have any
13  evidence of distraction from or response to
14  those internal stimuli?
15    A   Correct.
16    Q   Is that another way of saying he
17  didn't do or not do things based on what his
18  imaginary friend told him?
19    A   At least as overtly evident to the
20  examiner, that is correct.
21    Q   And Mr. Williams' memory was
22  observed to be fair?
23    A   Correct.
24    Q   And his adjustment good?
25    A   Yes.

46

1    Q   His ability to use abstract
2  thinking was also good?
3    A   Yes.
4    Q   You're a member of the APA?
5    A   Yes.  There are two APAs, but yes.
6  There's the American Psychiatric Association.
7  If you're asking a psychiatrist, we call that
8  the American Psychiatric Association.  If you
9  were asking a psychologist, they would call
10  that the American Psychological Association.
11  So I don't want to mix them up.
12    Q   Maybe I can help eliminate a
13  potentially unnecessary distinction for the
14  purposes of today.  Do the two organizations
15  define the term insight differently?
16    A   Probably not.
17    Q   Okay.
18    A   Yeah.
19    Q   How does the American Psychiatric
20  Association define the term insight?
21    A   Insight is the ability to step
22  outside one's self and look back and sort of
23  see the world in a somewhat realistic way.
24    Q   Would that also encompass
25  recognizing symptoms of one's own illness?

47

1    A   Yes.
2    Q   At least in terms of a mental
3  illness?
4    A   Yes.
5    Q   So Dr. DuBose noted that
6  Mr. Williams' insight was fair to poor?
7    A   Correct.
8    Q   But that's something different
9  from adjustment; correct?
10    A   It is considered something
11  different from adjustment.
12    Q   And Mr. Williams' adjustment was
13  noted to be good?
14    A   Correct.
15    Q   Now, there is a test that
16  Mr. Walker, Mr. Williams, was subjected to to
17  make sure that the effort he was giving and
18  the responses he was giving were reliable;
19  correct?
20    A   Correct.
21    Q   And what was the outcome of that
22  reliability test?
23    A   It was that his evaluation was
24  considered to be valid and reliable.
25    Q   It's the Rey's 15-Item Test of

48

1  malingering?
2    A   Correct.
3    Q   Is that a test that you use with
4  your patients?
5    A   I have given it in forensic
6  evaluations.  It's a screening instrument.
7  It's pretty simple.  If somebody scores
8  poorly, it's pretty overt that they're
9  malingering.  If they score well, it doesn't
10  rule out malingering, but --
11    Q   So put another way, that's a test
12  that you, as a professional, use to try and
13  screen out the people that are faking?
14    A   It is one way to try to screen out
15  faking.  That is correct.
16    Q   Okay.
17    A   And I have used it.
18    Q   Dr. DuBose noted that Mr. Williams
19  was capable of understanding detailed
20  instructions without difficulty; true?
21    A   Correct.
22    Q   And Dr. DuBose also noted that
23  Mr. Williams' adaptation was sufficient for
24  avoiding ordinary hazards, adjusting to
25  changes in routine and setting realistic

49

1    goals?
2        A    Correct.
3        Q    What does that mean to a
4    nonpsychiatry or psychology professional?
5        A    It would be hard to -- that would
6    be a good question for Dr. DuBose.  I don't
7    want to presume to know what he is referring
8    to.
9        Q    Okay.  Well, if in a report or an
10   evaluation of one of your patients you were to
11   note that adaptation is sufficient for
12   avoiding ordinary hazards, what would you mean
13   by that?
14       A    Probably not stepping into an open
15   manhole cover.
16       Q    So an ability to perceive and
17   avoid obvious dangers?
18       A    That would be -- no.  I don't know
19   that that -- some obvious dangers, ordinary
20   hazards.  An ordinary hazard, I don't know
21   that all danger is equal.  A stove top,
22   adaptation to know that that may be hot, more
23   common.  I mean, that -- ordinary hazards,
24   some dangers are not ordinary.
25       Q    Can you give me some examples of

50

1    dangers that, in your estimation, would be not
2    ordinary.
3        A    Looking at the other end of a
4    barrel of a loaded gun is not ordinary for
5    most people.  A year ago COVID was not
6    ordinary but it became ordinary.
7        Q    Unfortunately, looking into the
8    end of a -- the barrel of a loaded gun is
9    ordinary for some people, though, isn't it?
10       A    Perhaps.  Yes.
11       Q    And you would agree, wouldn't you,
12   that a gun is pretty readily recognized as a
13   dangerous object?
14       A    Yes.
15       Q    Or an instrument or a tool that
16   can cause very serious harm and death?
17       A    Yes.
18       Q    Looking at what I've marked as
19   Defendant's Exhibit 8, I'll let you refer to
20   your original notes.  All right.  So these are
21   your personal notes from a phone call with Tim
22   Haire?
23       A    That is correct.
24       Q    And when did that conversation
25   take place?

51

1        A    August 7th, 2020.
2        Q    Were there any other parties to
3    the conversation?
4        A    Not that I'm aware of.  No.
5        Q    Forgive me.  I have a hard time
6    reading your handwriting.
7        A    Sometimes I do as well.
8        Q    So we've got at the very top, it
9    says I believe Tim Haire and then two
10   different phone numbers?
11       A    That is correct.
12       Q    Then we drop down several lines
13   and then it says Javius Walker?
14       A    Correct.
15       Q    Albany, which is underlined.  And
16   then under that, does that say comic books?
17       A    That is correct.
18       Q    So under that, what does that say?
19       A    I thought he was younger.
20       Q    And then --
21       A    Do you want me to just keep
22   reading?
23       Q    That would be great.
24       A    All right.  I thought he was
25   younger.  Always trying to help.  Came to my

52

1    shop all the time.
2        Q    Okay.
3        A    Uh-oh.  It's my own handwriting.
4    Oh, far and wide as can man.  Take cans to
5    recycling center, CTR.
6        Q    Okay.  Far and wide as can man,
7    what does that mean?
8        A    My recollection is he said he was
9    known far and wide as the can man.
10       Q    Okay.
11       A    And then to give that some
12   context, he said he takes cans to the
13   recycling center.
14       Q    Okay.  And below that?
15       A    I thought he was impoverished.
16       Q    Okay.
17       A    Had a harder time than most
18   eating.
19       Q    Okay.  What does that mean?
20       A    And I'm not sure because it's on
21   two different lines.  Had a harder time than
22   most was probably in reference to him as a
23   general person.  He may have made some comment
24   to his eating and all I wrote down was eating.
25   So I don't think they are associated given

57

1    but I don't know how to quantify that.
2        Q    For example, you don't know
3    whether Mr. Walker, or Mr. Williams, spent
4    more or less time with Mr. Haire on a
5    day-to-day basis than say the aunt, Patricia
6    Johnson?
7        A    That is correct.
8        Q    Do you have any reason to believe
9    that Mr. Walker, or Mr. Williams, ever lived
10   with Mr. Haire?
11       A    No.
12       Q    In your Rule 26 report, you
13   conclude that Mr. Walker was not an adult of
14   ordinary intelligence.
15       A    Correct.
16       Q    What is the basis of that opinion?
17       A    Based on his -- on the records
18   that I reviewed and my experience, training,
19   and education.
20       Q    The records that we've just
21   finished going through, those Social Security
22   disability records --
23       A    Correct.
24       Q    -- the records in which each
25   psychologist, psychiatrist, and I think the

58

1    other lady I think was a doctor of education,
2    all found that Mr. Walker was operating in an
3    average intelligence level?
4        A    Yes, from a cognitive standpoint.
5    Intelligence encompasses a lot of different
6    arenas, and having intelligence on an IQ test
7    versus ordinary intelligence of being able to
8    make interpretations and function are
9    different entities.
10       Q    Do you have any evidence that
11   Mr. Walker, or Mr. Williams, had a decreased
12   IQ?
13       A    No.
14       Q    What evidence do you have that
15   Mr. Walker, or Mr. Williams, was unable to
16   respond appropriately to dangerous situations
17   prior to the incident at the Dollar General?
18       A    As outlined in the Rule 26 report,
19   he had numerous impairments which made him
20   have difficulty interpreting social
21   situations, and that would be -- that is an
22   interaction which, by definition, people may
23   call it antisocial, but it still has social
24   components.
25       Q    Give me an example.  What specific

59

1    examples did you encounter in your review that
2    leads you to believe that he was unable to
3    respond appropriately to a dangerous situation
4    prior to this shooting?
5        A    It's based on the totality of the
6    written review that certainly they reference
7    him having -- I mean, he had impairments that
8    he obtained Social Security disability for
9    based solely on those impairments, and those
10   impairments are ones that would make it
11   difficult for him to interact with others and
12   to be able to appreciate those situations.
13           In one of these evaluations, he
14   played his video game for almost the duration
15   of the examination according to Dr. DuBose.
16       Q    Well, but you would agree I think,
17   Dr. Norman, that playing a video game during
18   an interview with a psychologist or a
19   psychiatrist doesn't mean a person cannot
20   appreciate a dangerous situation?
21       A    That's correct.  Not in and of
22   itself, but it's -- it's not a leap to say
23   that that's abnormal behavior.
24       Q    So if I had my 12-year-old in here
25   right now with whatever the hand-held game

60

1    du jour is, well, probably on his cell phone,
2    that would to you be evidence that he couldn't
3    appreciate danger?
4        A    No.  And there's context that's
5    different on that between a 12-year-old and a
6    30-year-old, for sure, and that's just one of
7    many -- yeah.
8            He was labeled odd.  He was
9    labeled to have difficulty.  There is
10   diagnostic difficulty between schizotypal
11   personality disorder and autism spectrum
12   disorder; that is, there's a lot of overlap.
13   There would be debate in which schizotypal is
14   considered worse than autism spectrum
15   disorder, but those individuals have -- and
16   his were labeled as impairment in being able
17   to interpret social situations and understand
18   them the way a reasonable and ordinary person
19   would.
20       Q    Now, "reasonable and ordinary
21   person," is that a term used in the
22   psychiatric world?
23       A    I'd like to think that I can try
24   to determine what's reasonable.  There are,
25   I'm sure, legal definitions for reasonable and

61

1    often are depending on the test.  As a
2    clinician, I have thoughts on reasonable and
3    ordinary.
4        Q    So what is reasonable and ordinary
5    in the legal world is not necessarily the same
6    as what is reasonable and ordinary in the
7    psychological or psychiatric world?
8        A    There may be overlap.  I don't
9    know whether the definitions perfectly align.
10       Q    So that would be a no?
11       A    That would be a no.
12       Q    So what examples do you have for
13   me besides the fact that Mr. Walker played
14   video games during his psychiatric evaluations
15   that you believe showed evidence of an
16   inability to appropriately respond to a
17   dangerous situation?
18       A    The evidence, and as I've reviewed
19   it, he had a difficulty in perceiving reality
20   of there was an imaginary friend that would
21   talk to him.  That is certainly something that
22   if an imaginary friend were talking to you
23   while you walk up on something, you might
24   perceive that in a different way than somebody
25   that did not have an imaginary friend.

62

1        And an imaginary friend for a
2    six-year-old or eight-year-old is completely
3    different from an imaginary friend for a
4    30-year-old.
5        Q    And in any of the material that
6    you reviewed, did you find any evidence that
7    his imaginary friend ever distracted him from
8    what was going on around him?
9        A    No.
10       Q    Or alter his outward behavior in
11   any way?
12       A    Potentially, although the two
13   aren't linked.  So the answer is no, but it's
14   qualified in that the records do indicate that
15   he would have difficulty relating to the
16   general public, and that may be partially
17   related to all that's going on in his head,
18   including the imaginary friend.
19       Q    But you would agree, though, that
20   just because a person has difficulty relating
21   to the general public, that does not
22   necessarily mean that they are incapable of
23   understanding, oh, I shouldn't step in front
24   of this truck or, oh, I should look both ways
25   before crossing the street?

63

1        A    Correct.  Although it doesn't --
2    that doesn't rule it out.  I mean, somebody
3    that's autistically minded, right, they can
4    find themselves -- or schizotypal personality
5    disorder can find themselves so trapped
6    internally that they may walk up on a
7    crosswalk and not pay attention to what it
8    says and that's because of what's going on in
9    their head.  It may not happen every time, but
10   it certainly can happen, and that's one of the
11   impairments of that illness.
12       Q    And what evidence have you seen
13   that suggests that Mr. Walker's actions on the
14   day of the shooting were affected in any way
15   by his diagnoses?
16       A    Well, I mean, as a psychiatrist, I
17   would say on its face walking into that
18   situation as opposed to walking away from it
19   is evidence of some abnormality.  That's not
20   what most people do.
21       Q    But you would agree that there are
22   people that have no psychiatric diagnoses that
23   do exactly that?
24       A    That's correct.
25       Q    You reviewed -- well, let me back

64

1    up for a second.  You've mentioned autism a
2    couple of times.  Mr. Walker, or Mr. Williams,
3    was never diagnosed as being on the autism
4    spectrum, was he?
5        A    No.
6        Q    He was, though, at some point
7    diagnosed with schizotypal personality --
8        A    Correct.
9        Q    -- either traits or disorder?
10       A    Disorder.
11       Q    And schizotypal personality
12   disorder, that's something that exists on a
13   continuum; is that correct?
14       A    That's correct.
15       Q    So you have people who have milder
16   symptoms or don't show as many symptoms on one
17   end of the spectrum and folks on the other end
18   who may have more symptoms or more severe
19   symptoms?
20       A    Yes, in part.  I wouldn't agree
21   that they wouldn't have any symptoms, because
22   if they had no symptoms, they probably
23   wouldn't --
24       Q    Well, I'm --
25       A    I'm not trying to -- again, I'm

73

1  with you.
2      Q    Okay.  Did you review the
3  deposition transcript of Valeria Williams, the
4  rough draft?
5      A    Yes, a rough draft.  Yes.
6      Q    Or at least it's labeled as a
7  rough draft?
8      A    Yes.  Correct.
9      Q    And that had no affect whatsoever
10  on your opinions in this case?
11      A    It did not detract from my
12  opinions.  No.
13      Q    So you saw her testimony about
14  Mr. Walker being a pretty good student?
15      A    Yes.
16      Q    That he was very good at math?
17      A    Yes.
18      Q    He had never been held back?
19      A    Correct.
20      Q    Didn't have special education or
21  an IEP?
22      A    Correct.
23      Q    And that's, for anyone who gets to
24  read this later, an Individualized Education
25  Plan.

74

1      A    Correct.
2      Q    And does it surprise you that she
3  had no concerns about Mr. Williams'
4  intelligence?
5      A    No.
6      Q    And that she taught him right from
7  wrong?
8      A    Correct.
9      Q    And that he understood danger and
10  how to avoid danger?
11      A    Correct.
12      Q    That he knew guns were dangerous?
13      A    Correct.
14      Q    That he had been taught to avoid
15  guns?
16      A    Correct.
17      Q    In terms of intelligence and
18  cognition, I mean, he was able to teach his
19  siblings how to play card games like Spades?
20      A    Yes.
21      Q    And that requires a certain level
22  of abstract thinking and strategy?
23      A    Yes.  And it's consistent with his
24  testing on abstract thinking as from the 2009
25  evaluation.

75

1      Q    And that he was able to understand
2  the rules and the strategy behind the game
3  Battleship?
4      A    Yes.
5      Q    And that he was able to understand
6  and follow directions?
7      A    Yes.
8      Q    Does it surprise you that she
9  testified that Mr. Williams never had any
10  trouble distinguishing between dangerous
11  situations and those that are not?
12      A    No.
13      Q    That she never observed him do
14  anything that was dangerous to himself?
15      A    Correct.
16      Q    And that based on her experience
17  living with him from birth up until at least,
18  according to her testimony, around age 21,
19  that he was fully capable of appreciating that
20  intervening in an armed robbery was dangerous?
21      A    Correct.
22          MR. KING:  Objection to form.
23      Q    And yet none of that has any
24  affect on your opinions in this case or those
25  outlined in your Rule 26 report?

76

1      A    Correct.
2      Q    And what testimony, if any, from
3  Ms. Williams did you consider significant to
4  your opinions in this case?
5      A    I read it and considered all that
6  I read.  I don't know that there was a
7  particular word or sentence.
8      Q    So, on whole, it had no affect on
9  your opinions?
10      A    Correct.
11      Q    And you reviewed the testimony,
12  the deposition transcript of Donald Walker?
13      A    Correct.
14      Q    What part or parts of his
15  testimony had any affect on your opinions in
16  this case?
17      A    Other than I think there was some
18  discussion of his impairments, not much.
19  There wasn't a lot of recent contact that
20  either one of them had with Mr. Walker prior
21  to this incident.
22      Q    Several years?
23      A    Correct.
24      Q    For either one of them?
25      A    Correct.

77

1    Q    And let's see. I'm just running
2  down your screenshot list here. The Chicago
3  incident reports, you reviewed those?
4    A    I did.
5    Q    Do those have any affect on your
6  opinions in this case?
7    A    Not really. I'm trying to think
8  those through. I mean, he clearly called --
9  has called in -- well, I don't think he
10  called. There are a number of reports that
11  show him to be the victim of a crime or at
12  least an alleged victim on some of those
13  reports.
14    Q    Many of those reports actually
15  show he called it in, don't they?
16    A    They may. I don't know whether I
17  pulled that off that data.
18    Q    Well, if you look at the July 7,
19  2001 report, he's listed as the person
20  reporting offense; correct?
21    A    Yes, that is correct.
22    Q    And on April 4th of 2002, he's
23  also listed as the person reporting offense?
24    A    Correct.
25    Q    That was another simple battery,

78

1  at least as identified by Chicago PD?
2    A    That is correct.
3    Q    And then again on May 7th of 2003?
4    A    Correct.
5    Q    And he was the person reporting
6  offense?
7    A    That is correct.
8    Q    Again, June 25th, 2002?
9    A    The 2002 -- again, I'm not -- the
10  2002 doesn't say who reported it. It does
11  show him a potential --
12    Q    I'm sorry. I stand corrected.
13    A    Okay.
14    Q    So not specifically referenced is
15  the one who called it in on the June 2002?
16    A    That is correct.
17    Q    But on the November 11, 2003,
18  where he was the victim of a robbery, he was
19  the person who called it in?
20    A    Correct.
21    Q    And he was 17 years old at the
22  time?
23    A    That is correct.
24    Q    So at age 17, he knew to call the
25  police when there was a robbery happening?

79

1    (Whereupon off-the-record discussions
2  ensued.)
3    THE WITNESS: What was the
4  question?
5    (Whereupon the court reporter read back
6  the referred-to portion as follows:)
7    Q    So at age 17, he knew to call the
8  police when there was a robbery happening?
9    (Whereupon the reading back was
10  concluded.)
11    THE WITNESS: Based on this
12  document, that appears to be correct.
13    Q    (By Ms. Morton) And then
14  September 19th of 2004, he was the victim of a
15  simple battery and also the person reporting
16  the offense to police?
17    A    Correct.
18    Q    The same with October 1, 2004, he
19  was the victim of a simple battery and the
20  person reporting the offense to police?
21    A    Correct.
22    Q    November 20th, 2004, he was
23  attacked with a brick and was both the
24  victim -- let's see. They don't specify --
25  or, yes, they do. On the second -- no.

80

1  That's different. So there's no -- this
2  November 20, 2004, incident doesn't specify
3  who called the police?
4    A    Correct.
5    Q    Presumably none of the aggressors,
6  but outside of that, we don't know?
7    A    Actually, we don't know. I mean,
8  any one of these could be domestic. Somebody
9  that originated the call could have -- I mean,
10  I don't have any context other than there's so
11  much redacted in the reports that are
12  contained with most of these to give context
13  to many of these incidents.
14    Q    And then the February 23rd, 2005
15  robbery that he was a victim of, he was the
16  one who reported that offense to the police?
17    A    Correct.
18    Q    And then September 11 of 2007, he
19  was the victim of a simple battery and was
20  also the person reporting to the police?
21    A    Correct.
22    Q    So what, if anything, about these
23  Chicago Police reports involving Mr. Walker
24  had any affect on your opinions?
25    A    I still hold my opinions, as

81

1   outlined in the Rule 26, that he does have
2   capacity to apparently call law enforcement
3   under certain circumstances.
4        Q    Like when he's being robbed or
5   there is a robbery occurring?
6        A    Or an alleged robbery.  Yes.
7        Q    Or an alleged robbery.
8        A    That is correct.
9        Q    Or when he is being threatened
10  with bodily harm in the context of the simple
11  batteries?
12       A    Yes.  I would like more context.
13  Yes.
14       Q    So nothing about those reports
15  alters your opinions in the Rule 26 report in
16  any way -- and sorry.  Let me rephrase that so
17  it makes a little more sense when we read
18  this.
19            Nothing in the Chicago incident
20  reports affects the opinions that you outlined
21  in your Rule 26 report as to Javius's ability
22  to perceive and respond to a dangerous
23  situation?
24       A    That is correct.  It does not
25  alter my opinions as outlined in the Rule 26

82

1   report.
2        Q    All right.  Let's see.  We've
3   talked about the school records.  We've talked
4   about the Social Security documents.  We've
5   talked about the footage, the CCTV.
6            The Tamara Walker transcript,
7   what, if anything, about that transcript forms
8   your opinions in this case?
9        A    Not a lot.  I think there may have
10  been a reference, and if I'm recalling --
11  although I reviewed all three of those
12  recently, I believe Tamara Walker's -- my
13  recollection is that Tamara Walker used the
14  word autistic at some point in time in her
15  deposition, though, again, had no --
16  acknowledged having no clinical training or
17  medical training in that way and also no
18  recent contact with him.
19       Q    Anything else in her transcript
20  that was significant to you in any way?
21       A    No.
22       Q    Defendant's Exhibit 8, the notes
23  you made on your interview with Mr. Haire or
24  the interview in and of itself, what about
25  that interview was significant to your

83

1   opinions in this case?
2        A    Only as outlined or summarized in
3   a paragraph on page three of my Rule 26
4   report.  It provided some context for a non --
5   in my opinion, a nonparty that knew
6   Mr. Walker.
7        Q    So that Mr. Walker was very happy
8   but very simple?
9        A    Yes.
10       Q    Childlike in manner, differently
11  abled, and had his impairments?
12       A    And on the autism spectrum
13  according to Mr. Haire.
14       Q    And this is a layperson that has
15  no -- at least as far as you are aware, has
16  no medical training?
17       A    That's correct.  The context he
18  gave for on the autism spectrum was the
19  reference to his daughter.
20            (Whereupon a document was identified as
21            Defendant's Exhibit 10.)
22       Q    (By Ms. Morton) Let me show you
23  what's been marked as Defendant's Exhibit 10.
24  All right.  Is that the last item -- or the
25  last pdf on the screenshot, the invoice?

84

1        A    It is.
2        Q    And so how much have you charged
3   for your services to date?
4        A    $2,460.
5        Q    And how much unbilled time do you
6   have on the file?
7        A    Two to three hours.
8        Q    What did you review or what did
9   you do to prepare for today's deposition?
10       A    I had -- contained within that two
11  to three hours, I have -- I was provided the
12  Chicago crime reports, the three depositions,
13  and I relooked at the six pages of school
14  records and my -- and scanned through the
15  Social Security records and reread my Rule 26
16  report.
17       Q    In reviewing the Social Security
18  records, do you disagree with any of the
19  evaluations by any of the psychologists or
20  psychiatrists, and I'll just refer to them as
21  just generally the medical providers, in their
22  evaluation of Mr. Walker?
23       A    No.
24       Q    Not a single one of them states or
25  even hints at any inability to perceive or

85

1    respond appropriately to dangerous situations,
2    do they?
3        A    Not specifically, no.
4        Q    Not even --
5        A    That is correct.
6        Q    Not even generally?
7        A    In my opinion, they do -- I would
8    disagree in that they do talk about his
9    difficulties interacting and perceiving
10   certain situations, and that could include
11   this, in my opinion, especially given the
12   diagnostic category that they stated.
13       Q    But there was no specific concern
14   expressed or observation made that he was
15   unable to perceive and respond to a situation
16   that could cause him bodily harm?
17       A    That is correct.
18       Q    And none of those providers ever
19   concluded that Mr. Williams, or Mr. Walker,
20   had a low IQ?
21       A    That is correct.
22       Q    So to what extent do you believe
23   Mr. Walker's ability to perceive danger on the
24   day of the shooting was impaired?
25       A    I have an opinion that it was

86

1    impaired.  It would be difficult to ascertain
2    or provide further specificity.
3        Q    Well, it's not your opinion that
4    he just had no idea whatsoever what he was
5    doing, is it?
6        A    No.
7        Q    So what part of that situation, in
8    your opinion, could Mr. Walker not perceive or
9    appreciate?
10       A    I don't know how to answer that.
11   Is there another way you could ask that
12   question?
13       Q    Well, it's your opinion that his
14   ability to reasonably perceive the danger on
15   that day would have been impaired.  I want to
16   know why is that your opinion.  What part of
17   that situation could he not perceive of or
18   appreciate?
19       A    Given his diagnosis, his listed
20   impairment and psychiatric issues, and in
21   watching the video, he does not appear to
22   appreciate the danger within that situation.
23   I mean, on its face, it somewhat speaks for
24   itself.
25           And then given the diagnosis, it

87

1    is consistent with someone that -- and I'm
2    going to use the term autistic loosely.  And
3    then it also fits with schizotypal because of
4    the overlap but in the autistic way of sort of
5    being in one's own world in your head, that it
6    can impair one's ability to reasonably and
7    rationally appreciate danger and the
8    dangerousness of a situation.
9        Q    So then it's your opinion that --
10   well, and we agree that he's never been
11   diagnosed as being in the autism spectrum; is
12   that correct?
13       A    Correct.  That's why I qualified
14   the autistic word.  And then if you look at
15   schizo -- if you look at the criteria for
16   schizotypal personality disorder, you read
17   those, you read autism, and you're going to
18   see a large overlap, and there is a thought
19   that it is somewhat on a -- that that is even
20   on a spectrum.
21           Schizotypal personality disorder
22   is a different way or more severe way of
23   categorizing some adults with autism spectrum
24   disorder.  So the autistic thinking is not a
25   diagnosis.  It's a way of thinking, which

88

1    would be consistent with schizotypal
2    personality disorder.
3        Q    And that way of thinking is what?
4        A    The way of thinking is distracted
5    within one's self, sometimes so self-absorbed
6    as to not appreciate what is going on within
7    the social cues and what is going on within
8    one's world around them or to be able to
9    appropriately apply social convention to that,
10   which is why their interactions with others
11   can be so difficult and impaired.
12       Q    Well, Mr. Walker didn't have any
13   sort of cell phone or video gaming device
14   visible in the footage of the shooting, did
15   he?
16       A    That's correct.
17       Q    So he had no external distraction
18   that you observed in that video?
19       A    That is correct.
20       Q    Aside from the distraction of
21   looking at what's going on inside the store?
22       A    Correct.
23       Q    So then it's your opinion that he
24   was stuck inside his own head while he's
25   standing outside the closed doors looking in

## EXPERT WITNESS REPORT OF MATTHEW W. NORMAN, M.D.

Pursuant to Federal Rules of Civil Procedure 26(a)(2), Matthew W. Norman, M.D. submits an expert report as follows:

**(i) a complete statement of all opinions the witness will express and the basis and reasons for them;**

My opinions are based on my training and experience. I obtained my undergraduate degree in psychology from the University of Virginia in 1991. I obtained my M.D. from Mercer University School of Medicine in 1997. I completed my residency in psychiatry at Emory University in 2001, served as Chief Resident at Emory University Hospital in 2000 through 2001, and completed my fellowship in forensic psychiatry at Emory University in 2002. I am board certified in psychiatry with added qualifications in forensic psychiatry from the American Board of Psychiatry and Neurology. I have continuously practiced general and forensic psychiatry in Georgia since obtaining my medical license there in 1998, including diagnosing and treating Posttraumatic Stress Disorder (PTSD). I also hold an appointment and actively teach as an Adjunct Associate Professor with the Department of Psychiatry and Behavioral Sciences, Emory University School of Medicine. I was also appointed to the Georgia Composite Medical Board in 2019. Further, my CV is attached.

DEFENDANT'S
EXHIBIT
4
3-29-21 MH

On October 13, 2017, Mr. Javis Walker ("Mr. Walker") was involved in an incident resulting in his death by firearm during an armed robbery at a Dollar General store at 1906 E. Oglethorpe Boulevard, Albany, Georgia.

In September 2009, Mr. Walker was evaluated by Iowa Disability Determination Services. Evaluating psychiatrist, Anupama Upadhyay, M.D., diagnosed Mood Disorder, Not Otherwise Specified and Psychosis, Not Otherwise Specified. Evaluating psychologist, John Keraus, Ph.D., diagnosed Posttraumatic Stress Disorder; Psychotic Disorder, Not Otherwise Specified; Dissociative Disorder, Not Otherwise Specified; Schizotypal Personality Disorder; Reading Disorder; and Disorder of Written Expression. Mr. Walker was "noted to have developed an isolated, dissociative and self-contained fantasy world and lives in a schizotypal lifestyle as a coping strategy." At the time, Mr. Walker's aunt noted he had "no sense of appropriate social boundaries with others." The evaluation noted marked limitations in maintaining social functioning and maintaining concentration, persistence, or pace.

During a psychological evaluation signed by Philip J. DuBose, Jr, Psy.D. and dated November 9, 2016, Mr. Walker described hearing "voices a lot in [his] head." His aunt noted that Mr. Walker "will leave on the same [clothes] for [a] week." Dr. DuBose noted on mental status examination that Mr. Walker's insight (e.g., an ability to understand a piece of information) was "fair to poor." Dr.

DuBose diagnosed Mr. Walker with Schizotypal Personality Disorder and Posttraumatic Stress Disorder.  Dr. DuBose opined that Mr. Walker was "odd" and "appeared incapable of managing his own money."  He noted impairments in social interactions and would "have great difficulty relating to the general public without displaying aberrant behavior."

In paperwork submitted to the Social Security Administration in 2016, Mr. Walker wrote that during a typical day he may "play [his] game while talking to [his] imaginary friends."  He noted that he relied on his aunt to give him his medication.  He noted impairments in concentrating, remembering, understanding or following directions, completing tasks, and getting along with people (i.e., Mr. Walker stating: "people think I'm weird").

During a telephone interview with Mr. Haire (Mr. Walker's friend), Mr. Haire described Mr. Walker as "very happy but very simple."  From his lay perspective, he thought Mr. Walker was "on the Autism spectrum" and "child-like in manner."  Mr. Haire described Mr. Walker as "differently abled" and "had his impairments."

Mr. Walker was not examined by me.  He is currently deceased.  Thus, my opinions are qualified by the fact that I did not personally examine Mr. Walker. But, I was able to review extensive materials, including numerous medical records and video of the incident.

In my opinion to a reasonable degree of medical probability, Mr. Walker had impairments in his perception of reality, concentration, ability to understand a piece of information, and social interactions based on the evidence reviewed. Due to his impairments, Mr. Walker was not an adult of ordinary intelligence.

In my opinion to a reasonable degree of medical probability, Mr. Walker's ability to reasonably perceive the danger in the Dollar General on October 13, 2017 would have been impaired based on the evidence reviewed.

A review of the records, videos, and collateral telephone interview support numerous examples of Mr. Walker exhibiting impairments in his cognition, perception, and behavior.

These opinions are expressed to a reasonable degree of medical probability.

**(ii) the facts or data considered by the witness in forming them;**

1. Review of five surveillance videos from Dollar on October 13, 2017 (approximately thirty-nine minutes and forty-two seconds total);

2. School records of Javis Walker from the Board of Education of the City of Chicago (6 pages);

3. Medical records of Javis Walker (52 pages total), including Social Security Administration, Dr. Philip James DuBose, Jr., Iowa Disability

4

Determination Services, and Bridgeview Community Mental Health Center;

4. Telephone interview with Tim Haire on August 7, 2020 for approximately fifteen minutes;

5. <u>Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition</u> (DSM-5), American Psychiatric Association, May 2013;

**(iii) any exhibits that will be used to summarize or support them;**

The evidence in (ii) is incorporated.

**(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;**

Please refer to my Curriculum Vitae attached hereto as "Exhibit A."

**(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and**

Please see testimonial experience list attached hereto as "Exhibit B."

**(vi) a statement of the compensation to be paid for the study and testimony in the case.**

My customary charges in a case such as this are $600 per hour to review documents and records, and to prepare my expert reports. If I were called to testify at a deposition or in court, my customary charges would be $3000 for a half day and $6000 for a full day.

5

I reserve the right to change or modify my opinions as expressed herein based upon the receipt of additional information.

THIS 31st day of August, 2020.

Matthew W. Norman, M.D.